## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TRAMAYNE WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action File No. |
| | ) _____ |
| vs. | ) |
| | ) |
| MOUNT VERNON TOWERS | ) |
| CONDOMINIUM ASSOCIATION, INC., | ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) |
| _____ | ) |

## <u>COMPLAINT</u>

Plaintiff Tramayne Williams ("Plaintiff" or "Mr. Williams") hereby asserts his Complaint against the above-captioned Defendant Mount Vernon Towers Condominium Association, Inc., (hereinafter "employer" or "Defendant" or "Company") and shows the Court as follows:

### NATURE OF ACTION

1.

This cause of action arises under the provisions of Title VII of the Civil Rights Act, as amended (hereinafter "Title VII") and 42 U.S.C. §1981 ("Section 1981").

**JURISDICTION AND VENUE**

2.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §1343 (civil rights), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

3.

Venue is proper in this district and division pursuant to 28 U.S.C. 90 and § 1391 and Local Rule 3.1 because Defendant resides and maintains a place of business in the Northern District of Georgia, Atlanta Division, and the unlawful conduct complained of herein occurred in this judicial district and division.

**PARTIES**

4.

Plaintiff is an adult citizen of the United States of America and is entitled to bring actions of this nature and type. Plaintiff is a resident of Calhoun County, Georgia and has been a resident at all times material to Plaintiff's employment relationship with Defendant. Plaintiff is subject to this Court's jurisdiction.

5.

Defendant is a Georgia corporation with over 50 employees, that is registered to and does transact business in the State of Georgia. At the time of the acts

complained of herein, Defendant owned and operated a retirement community located at 300 Johnson Ferry Road NE, Sandy Springs, Georgia 30328 and the acts complained of herein occurred at that address.

6.

Defendant is subject to this Court's jurisdiction and may be properly served with process by delivering a copy of the Summons and Complaint upon its registered agent Randall Lipshutz, 100 Crescent Centre Parkway, Suite 200, Tucker, Georgia 30084. At all relevant times, Defendant was the employer of Plaintiff, as defined by Title VII and Section 1981.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

7.

Plaintiff has exhausted all administrative prerequisites prior to filing this action.

8.

Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), raising his claims for violation of Title VII. The EEOC completed its investigation and issued a Notice of Right to Sue. The Parties entered a Tolling Agreement extending the expiration of the Notice of Right to Sue by an additional thirty (30) days to allow the Parties time to explore

potential resolution.   Pursuant to the executed Tolling Agreement, Plaintiff brings this action within the time frame specified and agreed to by the Parties.

## STATEMENT FACTS

9.

Plaintiff Tramayne Williams is African American.

10.

Defendant is a senior retirement living community of over 300 condominiums.

11.

On August 1, 2014, Defendant hired Mr. Williams as the Dining Services supervisor for its retirement community located at 300 Johnson Ferry Road NE, Sandy Springs, Georgia 30328.

12.

In April 2015, Defendant promoted Mr. Williams to Dining Services Manager.

13.

In April 2017, Defendant assigned Mr. Williams to the Activities Department as a Catering and Events Manager.

14.

Upon being assigned to the Activities Department, Defendant removed Mr. Williams' supervisory authority and employees no longer reported to Mr. Williams.

15.

When Defendant assigned Mr. Williams to the Activities Department, Defendant viewed Mr. Williams as an Activities Coordinator, not a Catering and Events Manager.

16.

Defendant acknowledges that after reassigning Mr. Williams to the Activities Department, Mr. Williams continued to hold the title of Catering and Events Manager and that his job title was in name only.

17.

Upon being assigned to the Activities Department, Mr. Williams began reporting to Rita Malone, a white woman, who served as Mr. Williams' immediate supervisor.

18.

According to Defendant, Mr. Williams was responsible for scheduling events, setting up and breaking down event space for Activities Department events, running events, ensuring proper staffing for events, driving residents throughout the day to

appointments and errands, preparing flyers and slides for Defendant's closed circuit station Channel 6, assisting with the front desk and dining departments as needed, and other Activities Department responsibilities that may arise.

19.

During the time in question, Barbara Daugherty ("Ms. Daugherty"), who is white, served as an Activities Coordinator.

20.

Ms. Daugherty reported to Ms. Malone and was responsible for scheduling events, setting up and breaking down event space for Activities Department events, running events, ensuring proper staffing for events, preparing flyers and slides for Defendant's closed circuit station Channel 6, and other Activities Department responsibilities as needed.

21.

According to Defendant, Mr. Williams and Ms. Daugherty were equals in their roles.

22.

In or around January 2019, Defendant promoted Ms. Daugherty to the Activities Manager position.

23.

Defendant did not announce a vacancy for the Activities Manager position prior to selecting Ms. Daugherty.

24.

Mr. Williams was qualified for the Activities Manager position.

25.

Defendant did not give Mr. Williams an opportunity to apply for the Activities Manager position.

26.

The Activities Manager position required supervisory experience.

27.

Ms. Daugherty did not have any prior supervisory experience while under Defendant's employ.

28.

When Mr. Williams was the Dining Services Manager, he was told that he could not discipline Ms. Malone's daughter, Taylor Malone, nor could he assign her to work certain shifts or sections of the dining room.

29.

While Mr. Williams was the Dining Services Manager, Ms. Malone's daughter, Taylor Malone, was the only white employee who worked in Dining Services.

30.

Mr. Hamilton treated Taylor Malone differently than the African American employees who worked in Dining Services and he did not talk to Taylor Malone the same way he spoke to African American employees.

31.

After being hired as a server, Defendant promoted Taylor Malone to a position in administration.

32.

Taylor Malone had only worked as a server for a short period of time before being promoted to a position in administration.

33.

Defendant promoted Taylor Malone at a much faster pace than it promoted African American employees.

34.

On or around February 13, 2019, a group of Dining Services staff informally met with Mr. Williams to discuss their concerns of a difference in treatment among African American employees and white employees. The Dining Staff, who was predominantly African American, expressed concerns of white employees, including Taylor Malone, receiving better pay, better work hours, more flexible work schedules, and greater leniency as related to work rules and disciplinary action.

35.

In response to their concerns during the meeting on February 13, 2019, Mr. Williams advised the Dining Services staff to report their concerns of race discrimination to the U.S. Equal Employment Opportunity Commission ("EEOC").

36.

As of February 2019, Steve Hamilton (hereinafter "Mr. Hamilton") was serving as the Director of Human Resources for Defendant.

37.

On February 14, 2019, Mr. Hamilton confronted Mr. Williams for advising Dining Services staff to report their concerns of race discrimination to the EEOC.

38.

On February 14, 2019, Mr. Hamilton walked into Mr. Williams' office while pointing his finger at him and referred to Mr. Williams as "You." Mr. Hamilton then asked Mr. Williams if the Dining Services staff had met with him concerning an incident that occurred involving an African American Dining Services staff member on February 12, 2019. Mr. Hamilton also asked Mr. Williams whether he had advised the Dining Services staff to contact the EEOC with their concerns of race discrimination.

39.

When confronted by Mr. Hamilton, Mr. Williams confirmed that he had in fact met with the Dining Services staff.

40.

When confronted by Mr. Hamilton, Mr. Williams also confirmed that he advised the Dining Services staff to contact the EEOC about their concerns of race discrimination.

41.

In response, Mr. Hamilton told Mr. Williams, "[t]he staff should do what they are being paid to do and not complain… it's not like they are working hard. […] If

they feel they are being discriminated against, they can quit and find work elsewhere, it's not like they are excelling in service."

42.

Mr. Hamilton further told Mr. Williams, "[t]he residents know what real service is.  They have been serviced for years on planes, trains, at gas stations, buses, stations, and hotels.  So they know what real service looks and feels like."

43.

As the Director of Human Resources, Mr. Hamilton was responsible for creating and maintaining an environment that was free of discrimination.

44.

At all relevant times, the majority of Defendant's residents were white.

45.

At all relevant times, Defendant's Dining Services staff was predominantly African American.

46.

Mr. Hamilton's statements to Mr. Williams concerning residents' history of being "serviced for years on planes, trains, at gas stations, buses, stations, and hotels" had racist undertones.

47.

Mr. Williams felt that he could not report Mr. Hamilton's racist statements because as the Director of Human Resources, Mr. Hamilton was responsible for creating and maintaining an environment that was free of discrimination.

48.

During the meeting on February 14, 2019, Mr. Hamilton also told Mr. Williams that Nancy Kennedy, a white resident, tried to intervene and brought the Dining Services staff's concerns of race discrimination to the Board but she was advised by the Board that her complaint was insufficient.

49.

The complaints of race discrimination that Nancy Kennedy brought to the Board's attention were the complaints of former employees who were African American.

50.

During the meeting on February 14, 2019, Mr. Hamilton further told Mr. Williams that Nicole Sanders, an African American who served as the Restaurant Supervisor, "was not a good supervisor and she needed to be able to quell and resolve incidents like this and not participate or entertain them and other complaints."

51.

On February 18, 2019, Assistant Executive Director Rita Malone ("Ms. Malone") and Executive Director Christopher Peterson ("Mr. Peterson") called Mr. Williams into a meeting.

52.

Ms. Malone and Mr. Peterson called Mr. Williams into a meeting on February 18, 2019 for the purpose of terminating his employment.

53.

During the termination meeting, Mr. Peterson gave a single reason for ending Mr. Williams' employment.

54.

During the termination meeting, Mr. Peterson told Mr. Williams his employment was ending because his position was being eliminated.

55.

During the termination meeting, Mr. Peterson did not state any reason for terminating Mr. Williams' employment besides the elimination of Mr. Williams' position.

56.

During the termination meeting, Mr. Peterson acknowledged that Mr. Williams' separation was not for any reason related to performance.

57.

During the termination meeting, Mr. Peterson told Mr. Williams he was a good employee.

58.

During the termination meeting, Mr. Peterson told Mr. Williams there was no problem at all with his work.

59.

During the termination meeting, Mr. Peterson assured Mr. Williams that his position was simply being eliminated and the termination had nothing to do with performance.

60.

During the termination meeting, Mr. Peterson offered to provide Mr. Williams with a positive employment reference if he was ever contacted by a prospective employer.

61.

During the termination meeting, Ms. Malone did not disagree with Mr. Peterson's statements to Mr. Williams, including his statement that there was no problem with Mr. Williams' work.

62.

Mr. Peterson never offered any part-time work to Mr. Williams at any point during or after the termination meeting.

63.

Ms. Malone never offered any part-time work to Mr. Williams at any point during or after the termination meeting.

64.

Neither Mr. Peterson nor Ms. Malone ever offered an alternative position to Mr. Williams at any point during or after the termination meeting.

65.

At the time of firing Mr. Williams, Mr. Peterson informed Mr. Williams that he would be paid through the end of March 2019 because he was such a great employee.

66.

Other than Mr. Williams, Ms. Malone and Mr. Peterson were the only individuals who were present at the time of the termination meeting.

67.

Ms. Malone and Mr. Peterson never mentioned anything at all to Mr. Williams about attendance or performance issues when they conducted the termination meeting on February 18, 2019.

68.

The Severance Agreement Defendant offered Mr. Williams stated "elimination of position" as the reason for separation.

69.

Defendant completed a Separation Notice certifying to the Georgia Department of Labor ("DOL") that the reason for separation was "job elimination."

70.

On February 25, 2019, Mr. Williams filed a Charge of Discrimination with the EEOC.

71.

Defendant submitted two position statements to the EEOC in response to Mr. Williams' Charge of Discrimination.

72.

The Executive Director, Christopher Peterson wrote the initial Position Statement and filed it with the EEOC on Defendant's behalf.

73.

In the initial Position Statement, Mr. Peterson wrote that based on Ms. Malone's determination that the duties Mr. Williams was performing did not constitute a full-time position, he terminated Mr. Williams' employment at Ms. Malone's request.

74.

In the initial Position Statement, Mr. Peterson wrote, "[t]he reason for terminating [Mr. Williams'] position was that it was discovered that what he actually did during the week only took a fraction of the hours he was being paid for."

75.

In the initial Position Statement, Mr. Peterson wrote, that Ms. Malone made a determination that the Board should eliminate the second full time activities position because it was not appropriate to employ a second full-time person in the Activities Department.

76.

In the initial Position Statement, Defendant represented that during the Board meeting on January 12, 2019, the Board agreed with Ms. Malone's determination that the duties Mr. Williams was performing did not constitute a full-time position and as such, Mr. Williams' position would be eliminated upon that basis.

77.

As Defendant's Executive Director, Mr. Peterson signed the initial Position Statement to affirm the accuracy of the Position Statement and his agreement with its contents.

78.

Ms. Malone signed the initial Position Statement to affirm the accuracy of the Position Statement and her agreement with its contents.

79.

Mr. Hamilton also signed the initial Position Statement to affirm the accuracy of the Position Statement and his agreement with its contents.

80.

Defendant's Board of Directors signed the initial Position Statement to affirm the accuracy of the Position Statement and their agreement with its contents.

81.

Although the Board allegedly decided to eliminate Mr. Williams' position during the January 2019 Board meeting, Defendant did not terminate Mr. Williams' employment in January 2019.

82.

Defendant terminated Mr. Williams' employment more than one (1) month after the Board's meeting on January 12, 2019.

83.

On July 15, 2020, Defendant submitted a Supplemental Position Statement to the EEOC.

84.

In its correspondence to the EEOC dated July 15, 2020, Defendant included its response to the allegations set forth in Mr. Williams' Charge of Discrimination.

85.

In its correspondence to the EEOC dated July 15, 2020, Defendant sought to explain its version of the facts.

86.

In its correspondence to the EEOC dated July 15, 2020, Defendant sought to identify for the EEOC, the specific documents believed to support its position.

87.

In its correspondence to the EEOC dated July 15, 2020, Defendant asserted for the first time that Ms. Malone made the decision to terminate Mr. Williams' employment based on his alleged failure to distribute flyers on February 13, 2019.

88.

In its correspondence to the EEOC dated July 15, 2020, Defendant asserted for the first time that Mr. Hamilton terminated Mr. Williams' employment at Ms. Malone's request.

89.

More specifically, in its Supplemental Position Statement, Defendant alleged for the first time that on February 13, 2019, Ms. Malone instructed Mr. Williams to prepare flyers and provide the flyers to the Director of Customer Relations, Susan Robertson.  Ms. Malone believed Mr. Williams did not follow her instructions because he posted the flyer on the closed-circuit television channel, which was known to not be the most reliable source to provide residents with notice of important events.  Ms. Malone believed Mr. Williams' act of posting the flyer on the closed-circuit television channel caused chaos and confusion on February 14, 2019. Ms. Malone believed Mr. Williams' conduct of posting the flyer on the closed-circuit television warranted his dismissal.  Consequently, Ms. Malone asked Assistant

Executive Director, Steve Hamilton, to terminate Mr. Williams' employment based on his alleged failure to distribute the flyers.

90.

Defendant's initial Position Statement makes no mention of the explanations Defendant subsequently gave in its Supplemental Position Statement for having ended Mr. Williams' employment.

91.

Defendant's initial Position Statement does not state that Ms. Malone independently made the decision to terminate Mr. Williams' employment.

92.

Defendant's initial Position Statement does not state that the reason Ms. Malone made the decision to terminate Mr. Williams' employment was due to his alleged failure to ensure distribution of the flyers to residents.

93.

Defendant's initial Position Statement does not mention the alleged flyer distribution incident that occurred in February 2019 at all.

94.

Defendant acknowledges Mr. Williams and Barbara Daugherty (hereinafter "Ms. Daugherty") both shared in the responsibility to ensure distribution of flyers to residents.

95.

Defendant acknowledges Ms. Daugherty told Ms. Malone that she posted the flyer on the closed-circuit television channel, not Mr. Williams.

96.

When Ms. Malone believed it was Mr. Williams who posted the flyer on the closed-circuit television channel, she decided to terminate his employment upon that basis.

97.

When Ms. Malone learned that Ms. Daugherty posted the flyer on the closed-circuit television channel, Ms. Malone did not fire Ms. Daugherty.

98.

Defendant never fired Ms. Daugherty for posting the flyer on the closed circuit.

99.

Ms. Daugherty remains employed by Defendant to date.

100.

As part of her job duties, the Director of Customer Relations, Susan Robertson ("Ms. Robertson"), was in charge of distributing the mail and flyers to residents.

101.

As the Director of Customer Relations, Ms. Robertson was ultimately responsible for distributing flyers to residents in connection with the flyer incident that occurred on February 13-14, 2019.

102.

Ms. Robertson is white.

103.

Mr. Williams created the flyers as Ms. Malone requested.

104.

Ms. Malone told Mr. Williams that she would have Ms. Robertson distribute the flyers to residents.

105.

Ms. Robertson failed to distribute the flyers to residents.

106.

Ms. Robertson was never fired for failing to distribute the flyers to residents in connection with the incident that occurred on February 13-14, 2019.

107.

Ms. Robertson remains employed by Defendant to date.

108.

Mr. Williams was the only employee who was fired for allegedly failing to distribute the flyers.

109.

At no point prior to the EEOC's investigation, did Defendant ever inform Mr. Williams that he was being fired due to an alleged failure to distribute flyers to residents.

110.

At no point prior to the EEOC's investigation, did Defendant inform Mr. Williams that he was being fired due to an alleged failure to follow Ms. Malone's instructions as related to the creation and distribution of the flyers.

111.

Mr. Williams' position was not eliminated following Mr. Williams' termination.

112.

After firing Mr. Williams, Defendant hired a new employee who performed the same or similar job duties that Mr. Williams performed.

113.

The new employee Defendant hired to replace Mr. Williams is outside of Mr. Williams' race.

114.

As salaried employees, Mr. Williams and Ms. Daugherty both had flexible work schedules.

115.

Compared to Mr. Williams, Ms. Malone exhibited greater leniency towards Ms. Daugherty, with regard to the enforcement of workplace rules, including attendance and discipline.

116.

For example, Ms. Malone kept a log of the dates Mr. Williams was late or when he was not able to report to work.

117.

By contrast, Ms. Malone did not keep a log of the dates when Ms. Daugherty was late or was not able to report to work.

118.

Mr. Williams was disciplined for failing to report his absence to his immediate supervisor.

119.

Defendant did not discipline Ms. Daugherty when she failed to report her absences to her immediate supervisor.

120.

Ms. Malone was aware of instances where Ms. Daugherty was absent or late arriving to work

121.

Ms. Malone did not discipline Ms. Daugherty for her attendance infractions.

122.

Between June 2018 and February 2019, Ms. Daugherty had a higher number of tardies and absences than Mr. Williams.

123.

Defendant did not discipline Ms. Daugherty for her attendance infractions.

124.

Ms. Malone never made a determination that Ms. Daugherty's position should be eliminated.

125.

Ms. Malone never recommended to the Board that Ms. Daugherty's position should be eliminated.

126.

Defendant did not seek to eliminate Ms. Daugherty's position at all.

127.

Defendant treated Mr. Williams less favorably than Ms. Daugherty when it came to application of work place policies, including discipline and attendance.

128.

Ms. Malone was involved in the decision to terminate Mr. Williams' employment.

129.

Ms. Malone influenced the decision to terminate Mr. Williams' employment.

130.

Ms. Malone learned that Mr. Williams had advised the Dining Services staff to contact the EEOC before she asked Mr. Peterson to terminate his employment.

131.

At all relevant times, Mr. Hamilton had knowledge of Mr. Williams' protected activity.

132.

Mr. Hamilton referred to African American employees as "you people" and "these people" on several different occasions during the course of Mr. Williams' employment.

133.

Mr. Hamilton's repeated referencing of African American employees as "you people" and "these people" had racist undertones.

134.

Mr. Hamilton was involved in the decision to terminate Mr. Williams' employment.

135.

Mr. Hamilton influenced the decision to terminate Mr. Williams' employment.

136.

At all relevant times, Mr. Peterson had knowledge of Mr. Williams' protected activity.

137.

Mr. Peterson was involved in the decision to terminate Mr. Williams' employment.

138.

Mr. Peterson influenced the decision to terminate Mr. Williams' employment.

139.

During the termination meeting, Mr. Peterson never informed Mr. Williams that he was being fired for any reason other than "elimination of position."

**CLAIMS FOR RELIEF**

**COUNT ONE: RACE DISCRIMINATION  IN VIOLATION OF TITLE VII AND SECTION 1981**

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

140.

Defendant is an employer within the meaning of Title VII.

141.

Defendant is an employer within the meaning of Section 1981.

142.

At all relevant times to this action, Plaintiff was an "employee" of Defendant within the meaning of Title VII and Section 1981.

143.

Defendant discriminated against Plaintiff on the basis of race by failing to select Plaintiff for the Activities Manager position and by terminating Plaintiff's employment in violation of Title VII and Section 1981.

144.

Defendant discriminated against Plaintiff with respect to compensation, terms, conditions, and privileges of employment because Plaintiff was not the preferred race or color.

145.

Defendant's stated reason for the adverse employment actions are pretext for race discrimination.

146.

As a proximate and direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer damages including but not limited to, emotional distress, mental anguish, inconveniences, loss of income and benefits, humiliation, pain and suffering, and other indignities, for which he is entitled to recover.

147.

Defendants have engaged in this discrimination intentionally and/or with malice and/or reckless indifference to the rights of Plaintiff.

## **COUNT TWO: RETALIATION  IN VIOLATION OF**

## **TITLE VII & SECTION 1981**

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

148.

Plaintiff engaged in protected activity on or around February 13, 2019.

149.

Defendant retaliated against Plaintiff for engaging in protected activity, by terminating Plaintiff's employment.

150.

In terminating Plaintiff's employment, Defendant knowingly and intentionally retaliated against Plaintiff for engaging in protected activity.

151.

The reasons given by Defendant for the adverse employment actions are pretext designed to hide Defendant's retaliatory motive.

152.

Defendant's actions constitute unlawful retaliation in violation of the Title VII and Section 1981.

153.

At the time of the acts alleged, Defendant knew or should have known that the means utilized to punish Plaintiff for engaging in protected activity was forbidden by law.

154.

As a direct and proximate result of Defendant's actions, Plaintiff suffered lost wages, salary, employment benefits, and other compensation and continues to suffer stress and injury, compensable in an amount to be proven at trial.

155.

Defendant performed the above actions willfully, wantonly, intentionally and in reckless disregard of Plaintiff's federally-protected rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

1. Grant to Plaintiff a jury trial on all issues so triable;

2. Grant declaratory judgment that Plaintiff's rights under Title VII and Section 1981 have been violated;

3. Grant Plaintiff a permanent injunction prohibiting Defendant from engaging in such unlawful conduct in the future;

4. Order Defendant to compensate, reimburse, and make whole the Plaintiff for all the benefits he would have received had it not been for Defendant's illegal actions, including but not limited to pay, benefits, insurance costs, bonuses, raises, training, promotions, and seniority.  Plaintiff should be accorded these illegally withheld benefits from the date Plaintiff was discharged until the date Defendant tenders substantially equivalent employment, with interest on the above withheld amounts to the date of payment;

5. Award pre-judgment interest on any award of back pay made by the jury as required by law, calculated at the prevailing rate;

6. Award compensatory damages in an amount reasonable and commensurate with the losses he has suffered as a result of Defendant's discrimination and the pain and emotional distress imposed upon him by Defendant's intentionally discriminatory acts;

7. Award punitive damages in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future;

8. Award Plaintiff's attorneys' fees and any and all other costs and expenses of litigation associated with this action as provided by law; and

9. Award Plaintiff such additional relief as the Court deems proper and just.

RESPECTFULLY SUBMITTED,

This the 29th day of December, 2020.

SHELTON LAW PRACTICE, LLC

By:     /s/     Cherri L. Shelton
        Georgia Bar No. 27693

Shelton Law Practice, LLC
1827 Powers Ferry Road SE
Building 25, Suite 100
Atlanta, GA 30339
Phone: (404) 865-3771   Facsimile: (678) 882-7499
cshelton@sheltonlawpractice.com